Christopher P. Ridout (SBN 143931)
christopher.ridout@zimmreed.com
Arielle M. Canepa (SBN 329546)
arielle.canepa@zimmreed.com
ZIMMERMAN REED LLP
2381 Rosecrans Ave., Suite 328
Manhattan Beach, CA 90245
(877) 500-8780 Telephone
(877) 500-8781 Facsimile

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN RAAMS and AMY RAAMS, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>      v.<br><br>RUSHMORE LOAN MANAGEMENT SERVICES, LLC, a Delaware limited liability company,<br><br>      Defendants. | CASE NO.: 8:21-CV-00741<br><br>*Assigned to the Honorable:*<br><br>**CLASS ACTION COMPLAINT**<br><br>1. Breach of Contract<br>2. Breach of Implied Covenant of Good Faith and Fair Dealing<br>3. Violation of 12 C.F.R. § 339.7 *et seq.*<br>4. Violation of California Unfair Competition Law, Business and Professions Code §17200, *et seq.*<br>5. Money Had and Received (Restitution)<br>6. Unjust Enrichment<br><br>**(JURY TRIAL DEMANDED)** |

Plaintiffs John Raams and Amy Raams ("Plaintiffs"), by and through their undersigned counsel, on behalf of themselves and all others similarly situated, bring the following Class Action Complaint against Defendant Rushmore Loan Management Services, LLC ("Defendant" or "Rushmore"), based upon information and belief and the investigation of counsel, except for information based on personal knowledge, and hereby allege as follows:

## I.    INTRODUCTION

1.    This is a class action filed to redress injuries that Plaintiffs and a class of California, South Carolina, and nationwide consumers have suffered and will continue to suffer as a result of the practices of Defendant relating to force-placed insurance policies. Plaintiffs and Class members allege that Defendant derives improper financial benefits by imposing force-placed flood insurance policies on properties. In addition, on information and belief, Defendant Rushmore is charging residential borrowers for the "cost" of procuring force-placed insurance. On information and belief, a portion of such "cost" is returned, transferred, kicked-back or otherwise paid to Rushmore and/or its related entities. Rushmore and/or its related entities do no meaningful work for the sums received, and therefore the payments amount to an unearned kickback designed to encourage the referral of business at extraordinarily high prices.  Plaintiffs seek to recover damages equal to the amount of the improper and inequitable financial benefit received by Defendants and/or their affiliates as a result of this anti-consumer practice, and to rescind the future collection of amounts charged against the mortgage accounts of residential borrowers but not yet collected.

2.    Lenders require borrowers to purchase and agree to maintain hazard insurance coverage on the secured property as a condition to funding home loans. Plaintiffs were required to obtain and maintain flood insurance as a condition to their mortgages.

3.    Plaintiffs maintained flood insurance through the insurance provider of their homeowner's association and provided proof of flood insurance to Defendant on

multiple occasions. Defendant declined to acknowledge Plaintiffs' proof of secured insurance and charged them for a considerably more expensive policy and forced Plaintiffs to pay for the policies by diverting the monthly mortgage payments and/or debiting the borrowers' escrow accounts. These policies are known as "force-placed" or "lender-placed" insurances policies. Such policies provide less coverage and are substantially more costly (5 to 10 times the price) than borrowers' original policies, and provide improper, undisclosed, and lucrative financial benefits and kickbacks to lenders/servicers and/or their affiliates, as well as to providers of force-placed insurance. On information and belief, Defendant declines to acknowledge the proof of secured insurance of other similarly situated borrowers and continues to charge for force-placed insurance.

4. Here, Defendants have engaged in a pattern of unlawful and unconscionable profiteering and self-dealing in regards to their purchase and placement of force-placed insurance policies in bad faith.

5. In this action, Plaintiffs challenge Rushmore's practice of purchasing force-placed flood insurance to obtain a commission or kickback, resulting in unauthorized, unjustified and unfairly inflated costs to the borrower for force-placed insurance in violation of law. In doing so, Rushmore acted with bad motive and bad intentions and in order to penalize Plaintiffs and the Class.

6. As set forth in detail below, Defendants have engaged in unlawful, abusive and unfair practices with respect to force-placed insurance by receiving kickbacks in the form of purported fees, payments, commissions, "rebates" and/or other things of value from providers of force-placed insurance.

7. On information and belief, Rushmore entered into agreements with an insurance provider, pursuant to which Rushmore and/or its subsidiaries or affiliates typically receive a portion of the premiums for each force-placed insurance policy purchased for a borrower. Moreover, on information and belief, those arrangements are exclusive. On information and belief, Defendants have received more than $5 million in

kickbacks from FPI policies imposed on class members during the class period.

8. In bringing this class action, Plaintiffs do not challenge the rates filed by the insurance provider and/or any other insurance carrier. Plaintiffs do not challenge the rates of their force-placed flood insurance provider as excessive. Rather, Plaintiffs challenge the manner in which Defendants failed to acknowledge Plaintiffs' repeated attempts to prove their private insurance, selected by this insurance provider and their force-placed insurance products, the manipulation of the force-placed insurance process by Rushmore, and the impermissible kickbacks that were included in the premiums that were added to the balance of Plaintiffs' and the Class members' mortgage loans.

9. Plaintiffs do not complain that they were charged an excessive insurance rate; rather, he/they complain that Rushmore acted unlawfully and in bad faith and motive when it declined to acknowledge the proof of insurance they provided on multiple occasions, selected the particular insurance company and its particular rates and coverage, when other, more suitable options were available, and when provided with evidence demonstrating that borrowers like them have in place flood insurance coverage that complies with their loan contract's requirements to maintain flood insurance, failed to terminate the force-placed insurance in violation of the Code of Federal Regulations. *See* 12 C.F.R § 339.7.

10. Defendant failed to notify their lender placed insurance provider to terminate any insurance purchased by the FDIC–supervised institution or its servicer, within 30 days of receiving notice from Plaintiff in violation of 12 C.F.R. § 339.7(b)(1).

11. Defendant, a loan servicer, failed to "refund to the borrower all premiums paid by the borrower for any insurance purchased by the FDIC–supervised institution", and so violated 12 C.F.R § 339.7(b)(ii).

12. Thus, while Plaintiffs do not challenge Rushmore's ability to force-place insurance policies and to charge fees/premiums for the same, Plaintiffs challenge the manner in which Defendants manipulated the force-placed insurance process for their own financial gain, with bad motive, in breach of Rushmore's contractual duties and in

violation of statutory and common law.

13.     Upon information and belief, Defendants receive unlawful kickbacks from the insurance provider in operation of this force-placed scheme.

14.     At issue in this case is whether Defendants have been unjustly enriched by manipulating the force-placed insurance process so as to obtain unearned kickbacks and breached the express and/or implied terms of the mortgage contract (including the implied covenant of good faith and fair dealing) by unreasonably, unconscionably and unlawfully exercising their contractual discretion to manipulate the force-placed insurance process so as to obtain financial benefits for themselves at Plaintiffs' and Class members' expense, and in turn, misrepresenting the true cost of insurance charged to class members and overcharging them beyond that permitted by the contract. In this action, Plaintiffs challenge Defendants' unlawful conduct and seeks compensatory damages, restitution for Defendants' unjust enrichment, declaratory, injunctive and other equitable relief.

## II.     THE PARTIES

15.     Individual and representative Plaintiff John Raams owns a home and resides primarily in North Myrtle Beach, South Carolina. Plaintiff John Raams is a member of the proposed Class.

16.     Individual and representative Plaintiff Amy Raams owns a home and resides primarily in North Myrtle Beach, South Carolina. Plaintiff Amy Raams is a member of the proposed Class.

17.     Defendant Rushmore Loan Management Services, LLC is a Delaware limited liability company. It maintains its principal place of business at 15480 Laguna Canyon Road, Suite 100, Irvine, CA 92618. Rushmore's agent for service of process in California is CSC, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California 95833.

## III.     JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action pursuant to the

Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA") because at least one Class member is of diverse citizenship from Defendants, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest or costs.

19.     This Court has personal jurisdiction over Defendants because Defendants are licensed to do business in California or otherwise conduct business in the State of California, a substantial portion of the wrongdoing alleged by Plaintiffs occurred in the State of California and this District, Defendants have sufficient minimum contacts with and/or otherwise have purposefully availed themselves of the markets of the State of California and this District such that it is fair and just for Defendants to adjudicate this dispute in this District.

20.     Venue is proper in this District because Defendant Rushmore is a resident of this District and maintains its principal place of business in this District, a substantial part of the events, transactions, and/or omissions giving rise to the claims asserted herein occurred in this District; and, a substantial portion of Defendants' alleged wrongdoing is believed to have occurred in this District.

## IV.     GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS
## A.     OVERVIEW OF FORCE-PLACED INSURANCE

21.     When a home loan is approved, the mortgage servicer typically requires the borrower, under the terms of the mortgage, to carry the proper amount of hazard or flood insurance on the property to insure it against any perils. While force-placed insurance has been part of the mortgage process for decades, the full extent of the previously undisclosed kickbacks, unearned commissions, and profit structures have only recently been uncovered.

22.     Each and every mortgage at issue in this litigation that was owned and/or serviced by Rushmore prior to any sale of the loan by Rushmore to another loan servicer requires borrowers to purchase and agree to maintain hazard or flood insurance coverage on their secured property as a condition to closing.

23.     In Plaintiffs' case, Rushmore sold the loan to Flagstar Bank ("Flagstar").

24.     On information and belief, Class members' mortgage contracts are standard-form Freddie-Mac or Fannie Mae contracts ("uniform instruments") of adhesion that contain the same or materially the same clauses addressing the lender's ability to force-place insurance, exercising its own discretion.

25.     In order to ensure that the mortgagee's interest in the secured property is protected, mortgage loan contracts typically allow the lender or third-party servicer to "force-place insurance" when the homeowner fails to maintain insurance; the amounts disbursed for the procurement of such insurance become additional debt secured by the mortgage.

26.     The applicable statutory authority provides, "[i]f an FDIC–supervised institution, or a servicer acting on its behalf, determines at any time during the term of a designated loan, that the building or mobile home and any personal property securing the designated loan is not covered by flood insurance or is covered by flood insurance in an amount less than the amount required under § 339.3, then the FDIC–supervised institution or its servicer shall notify the borrower that the borrower should obtain flood insurance, at the borrower's expense, in an amount at least equal to the amount required under § 339.3, for the remaining term of the loan." 12 C.F.R. § 339.7(a).

27.     After providing notice to the borrower pursuant to the foregoing regulation, Defendant is permitted to "to obtain flood insurance within 45 days after notification, then the FDIC–supervised institution or its servicer shall purchase insurance on the borrower's behalf." *See* 12 C.F.R. § 339.7(a).

28.     Defendant forced the lender placed flood insurance product in violation of 12 C.F.R. § 339.7(a) because after providing notice to Plaintiff Raams that Rushmore did not have record of adequate flood insurance, Plaintiff promptly provided his private flood insurance records by fax and phone to Rushmore. Rushmore failed to confirm receipt of these records and charged Plaintiff, despite Plaintiff's response to the notice with proof of flood insurance coverage.

29. Plaintiff received notice from Rushmore on or around February 2020 that Rushmore did not have record of Plaintiff's private flood insurance. Plaintiff's agent faxed proof of insurance to Rushmore on February 20, 2020.

30. Defendant failed to terminate the Plaintiff's forced-place insurance within 30 days of receiving proof of private insurance and failed to refund the borrower "all premiums paid by the borrower for any insurance purchased by the FDIC–supervised institution or its servicer" in violation of 12 C.F.R. § 339.7(a)-(b). *See* 12 C.F.R. § 339.7(a)-(b).

31. On information and belief, Class members' mortgage agreements contain such a provision affording Rushmore the authority to force-place their insurance in the event of a lapse. Thus, the failure of a borrower to maintain flood insurance is clearly contemplated by the mortgage contract and such a failure by the borrower does not result in a material failure to perform under the mortgage contract.

32. This discretion afforded to Defendants to force-place insurance is limited by the bounds of reasonable conduct and by the express terms of the mortgage contract itself. Defendants routinely exceed the bounds of reasonableness and the spirit, intent and letter of the mortgage contract itself by force-placing insurance in a manner and in amounts that are not required to protect the lender's interest in the property in an effort to reap profits from the borrower which are not required nor contemplated by the mortgage contract and through other conduct described herein with respect to the force-placement of insurance.

33. On information and belief, the mortgage contract does not disclose that the lender or servicer, or their affiliates, will receive a "commission" or other compensation from the force-placed insurance providers for purchasing the insurance or that the commission will be based upon a percentage of the cost of the premium of the force-placed insurance. Furthermore, the mortgage contract does not disclose that the cost of the force-placed policy will incorporate certain costs not properly chargeable to the borrower.

34. Any commissions received by Rushmore are unearned and unreasonably charged to class members as part of the force-placed insurance premiums. No services are performed for these commissions. Rather, any nominal services performed in relation to the placement of the force-placed policies are performed by Rushmore's selected insurance provider ("Insurer"), not Rushmore. On information and belief, this Insurer is more than compensated for any services they perform through the portion of the force-placed insurance premiums they retain. The payments to Rushmore are undisclosed and unauthorized kickbacks.

35. Additionally, once a lapse in hazard or flood insurance occurs, Plaintiffs and the Class have no way of refusing the charges for the force-placed insurance premiums. Likewise, once a lapse occurs, and the lender or third-party servicer decides to force place insurance, Plaintiffs and the Class have no way of retroactively placing the policy with a low-cost insurance provider. The decision is 100% that of the lender and Plaintiffs and the Class are completely at the mercy of the lender to exercise its discretion in good faith when force placing the policy and selecting the insurance provider and applicable rate.

36. These lender-placed or "force-placed" insurance policies are almost always more expensive than standard insurance coverage. Such policies can cost as much as ten times more than comparable or better, more comprehensive insurance policies that are easily available in the marketplace. While the force-placed insurance policy is for the benefit of the lender, the cost is passed on to the borrower. On information and belief, Defendant's selected Insurer to contract with and operate this scheme. Defendant and Insurer shared financial incentives and took place in self-dealing, acted in bad faith and breached the implied covenant of good faith and faith dealing.

## B. DEFENDANT'S FORCE-PLACED INSURANCE PROGRAM

37. Rushmore owns and services real property mortgages. Rushmore is one of the many large mortgage owners or servicers in the country that have reaped an improper and substantial windfall from the force-placement of insurance on borrowers' property through the manipulation of the force-placed insurance market.

38. To accomplish the force-placement of insurance and the associated premiums, Rushmore, in bad faith and motive, entered into exclusive arrangements with Insurer whereby Rushmore secure coverage on the consumer's property and then charge the consumer for the premiums it allegedly paid to the insurers' affiliates.

39. The premiums charged for force-placed insurance are not arrived at on a competitive basis and are significantly higher than those available to Defendants in the open market for comparable or more comprehensive policies. Servicers, like Rushmore, have no incentive to comparison shop for lower cost insurance with comparable or better coverage. Rather, Rushmore is financially motivated to procure policies from the provider that will provide the best financial benefit to the servicer in terms of kickbacks, unearned commissions and/or other compensation (often in the form of low-cost administrative services).

40. Upon information and belief, Insurer paid Rushmore in cash and/or through the provision of other things of value as an incentive to enter into the exclusive contractual relationship with it. Likewise, despite there being no attempt to shop for a competitively priced policy, the commissions on force-placed polices are significantly higher than those available on lower priced insurance policies of comparable or better coverage. Accordingly, no good faith, arms-length transactions are taking place. Rather, such attempts are completely by-passed in favor of Defendants' decision to exploit the situation and self-deal without concern for the resulting consequences (and inflated and unnecessary costs) placed on the borrower/class member. Simply put, Defendants exercise their discretion to intentionally secure the highest priced, lowest coverage policies that allow them to maximize their fees and revenue, while the class members bear the entire financial burden. This type of situation is generally referred to as reverse competition.

41. As a result, the amounts charged by Rushmore for force-placed insurance policies are many times more than what borrowers paid for voluntary coverage and many times more what Rushmore would pay if it had obtained insurance coverage on a

competitive basis on the open market and without the exclusive arrangements described above. Moreover, force-placed insurance policies provide less coverage than voluntary insurance policies, as they protect only the lender's interests in the property.

42. Defendants' force-placed insurance scheme operates in the same or materially the same manner for all class members.

43. When a borrower's policy lapses, Rushmore will charge the cost of the premium to the borrower. Upon information and belief, Rushmore then retains 35% of the payments as a kickback, disguised as commissions. These kickbacks induce Rushmore into continuing its exclusive relationship with Insurer and force-placing a more expensive policy than might otherwise have been obtained.

44. This arrangement provides Rushmore with an incentive to purchase the highest priced force-placed insurance policy possible – the higher the cost of the insurance policy, the higher the commission or kickback. Ultimately, the borrower pays.

45. The commissions or kickbacks are paid by Insurer or its affiliated insurance companies to Rushmore in order to manipulate the force-placed insurance market and continue their pre-existing, uncompetitive, and exclusive relationship with Rushmore, or other servicers.,

46. Essentially, Insurer is engaging in a form of commercial bribery in order to induce Rushmore to purchase high-priced force-placed insurance policies and have Rushmore refrain from seeking competitive bids in the market.

47. Upon information and belief, the kickbacks paid by Insurer to Rushmore are directly tied to the cost of the force-placed insurance and are usually a significant percentage of the total cost of each premium.

48. Rushmore never obtains an individual policy for any individual borrower. In fact, Rushmore's entire mortgage portfolio is covered by a pre-arranged master policy with Insurer. Rushmore, therefore, plays no role in purchasing insurance for an individual homeowner. Therefore, Rushmore has done nothing but enter into an exclusive and all-inclusive agreement with Insurer. Upon information and belief, any actual work

performed by Rushmore, which is claimed to entitle them to a commission for the placement of a policy is false and non-existent. In turn, the premiums or cost of insurance coverage represented and charged to class members is deceptive, misleading, false and inflated by the amount given to Rushmore, breaching the contract.

49. Upon information and belief, Insurer's agreement with Rushmore provides that all properties within Rushmore's portfolio will be monitored by Insurer and if a homeowner's policy voluntarily lapses or is deemed insufficient; such property will be automatically force-placed with an insurance policy provided by Insurer. The insurance is automatically placed on the property and the premium is ultimately charged to the homeowner even if the lapse is discovered many months or years later. The force-placed polices issued by Insurer pursuant to the scheme previously described, and further described below, generate improper and unjust windfalls to Insurer and their affiliates at the expense of the borrowers in the Class with whom have no contractual relationship. The sole justification for the tactics described above and below is the unjust enrichment of the Defendants, including Insurer and/or their affiliates with whom Plaintiffs have no contractual relationship.

50. Upon information and belief, when a lapse in a homeowner's insurance is discovered, an automated process is applied to all borrowers like Plaintiffs and the Class. For example, Insurers' software begins a cycle, at regular intervals, of identical form letters, form insurance policies and "binders" purporting to come from Rushmore that are sent to borrowers regarding the lapse in insurance and the force-placement of insurance through Insurer or its affiliates.

51. Therefore, Rushmore is paying Insurer not only for force-placed insurance premiums, but also for a bundle of services including performing Rushmore's duty of administering and servicing the mortgages (i.e., monitoring and tracking Rushmore's portfolio for insurance lapses and providing notification and customer service to homeowners under the mortgage). This bundle of administrative services includes Rushmore's cost of monitoring and servicing its portfolio of loans and is not properly

chargeable to Plaintiffs or the Class under their mortgages.

52. Under this common course of conduct in force-placing insurance, the "premiums" for insurance that are charged to the Plaintiff and the Class are exorbitant and illegal because they include not only the high (and non-competitive) cost of the insurance, but also illegal kickbacks to Rushmore, which performs little to no functions or services related to the force-placement of the individual policies. Further, the cost of the bundle of administrative services that Insurer are providing to Rushmore is subsumed within the high premium cost.

53. Therefore, in addition to performing no work in the actual placement of the force-placed policy, Rushmore's actions, in concert with Insurer, act to penalize borrowers, including Plaintiffs and the Class, by sticking them with the highest priced force-placed insurance policy possible. Rushmore abuses its discretion to force-place insurance arbitrarily, in bad faith and with bad motive and intent in order to secure a substantial kickback from Insurer and self-deal.

54. Generally, the high-cost premiums are added to the principal balance of the borrower's mortgage loan or deducted from his or her tax and insurance escrow account.

55. The actions and practices described herein are undertaken in bad faith and motive. Defendants misrepresent to individual borrowers that they will procure a policy to cover the risk arising from their properties when, in fact, borrowers already have a policy in place. Defendants then charge borrowers inflated premiums for the master policy, which are calculated to include kickbacks and costs not properly charged to the borrower without regard for competition on the open market. Defendants' only goal is to maximize their profits by charging high prices and collecting unjustified kickbacks.

56. Defendants' manipulation of the force-placed insurance process has maximized the profits to themselves to the great financial detriment of Plaintiffs and the Class, who are never treated fairly or even consulted during the process. Defendant was not, and is not, authorized by any federal, state, or local governing body, contract, or agreement to manipulate their force-placed insurance purchases in bad faith, as alleged

above.

57. The force-placed insurance business is not new, but Defendants' practice of capitalizing on their ability to generate inflated commissions and bolster their bottom line is new and recently has been exposed. As The New York Times has reported:

> "Force-placed insurance appears to be the dirty little secret of the mortgage industry," Mr. Lawsky [the superintendent of the New York State Department of Financial Services] said in an interview last week. "It is a silent killer harming both consumer and investors while enriching the banks and their affiliates."
>
> * * *
>
> Force-placed insurance has exploded during the foreclosure crisis. Once a backwater that generated $1 billion a year, it is now a $6 billion-a-year business. Much of its growth has come on the backs of homeowners.
>
> * * *
>
> There is a lot to love about force-placed insurance — if you sell it. The policies typically cost at least three times as much as ordinary property insurance. Some borrowers have been charged much more — up to 10 times the prevailing rate — according to people knowledgeable about these practices who spoke on condition of anonymity to maintain business relationships.
>
> * * *
>
> All in all, force-placed insurance represents a major profit center for mortgage servicers and the companies that write the policies. In many cases, you will not be surprised to learn, the servicers and the insurers are affiliated. This sets up the potential for conflicts of interest among loan servicers that are often supposed to represent investors owning mortgage loans bundled into securities.
>
> * * *

> Many banks have set up affiliates that provide this insurance or take on some of the risks that other companies have insured, known as reinsurance. These cozy relationships are a focus of investigators.

> *   *   *

> Insurers that are not affiliated with lenders have paid fees from 15 to 20 percent of the policy to the banks that place the insurance, according to former industry executives. This indicates how lucrative the business is.[1]

58.     Upon information and belief, Insurer pays kickbacks in the form of inflated commissions and/or similar unlawful sums to Rushmore in connection with force-placed insurance. The kickbacks paid by Rushmore to lenders and/or their affiliates on force-placed insurance coverage are the subject of numerous reported cases and government investigations.

59.     Furthermore, these fraudulent practices have recently come under examination by all fifty State Attorney Generals as part of a nationwide investigation requiring that force-placed insurance be reasonable.  And, as the State Attorney Generals have recognized, this practice has greatly contributed to the foreclosure crisis.

60.     Investigation of the industry by the New York Department of Financial Services has uncovered evidence of abusive practices in the industry occurring at the expense of homeowners. The investigations found: (1) "The premiums charged to homeowners for force-placed insurance are two to ten times higher than premiums for voluntary insurance even though the scope of the coverage is more limited"; (2) "Insurers and banks have built a network of relationships and financial arrangements that have driven premium rates to inappropriately high levels"; and (3) "force-insurers, rather than competing competed for business from banks and mortgage servicers by offering lower

---

[1]   Gretchen Morgenson, *Hazard Insurance With Its Own Perils*, The New York Times, January 22, 2012, p. BU1, *available online at* <http://www.nytimes.com/2012/01/22/business/hazard-insurance-with-its-own-perils-fair-game.html?pagewanted=print> (last accessed January 13, 2020).

prices, have instead created incentives for banks and mortgage servicers to buy force-placed insurance with higher premiums by enabling the banks and mortgage services, through complex arrangements, to share in the profits associated with the higher prices."[2]

61. Expert Economist and former insurance regulator, Birny Birnbaum completed a comprehensive overview of forced-placed practices through the National testified before the Florida Office of Insurance Regulation on Behalf of the Center for Economic Justice on July 3, 2012.[3] Birnbaum's report concluded, *inter alia*, (1) "The Lender-Placed Home Insurance (LPI) market is characterized by reverse competition, in which the cost of insurance placed on the borrower's loan is pushed up by LPI insurers in competition for servicers' business"; (2) "The LPI market is not beneficially competitive to consumers, as evidenced by numerous measures, including market concentration, high prices, low loss ratios, insurer profitability and kickbacks to servicers"; and (3) "[Insurance company's] argument that higher-than-indicated rates are needed because of "market uncertainty" and because of "large volumes of seriously delinquent loans, changing loan servicing and loan modification requirements, and a persistent backlog of [real estate owned] properties" is without empirical support." Birnbaum's statements accurately describe Defendants' nationwide (and California) practices with regard to force placed insurance, in material respects.

62. Plaintiffs do not dispute that Rushmore is entitled under Plaintiffs' and each Class member's mortgage to purchase force-placed insurance when a lapse in coverage actually occurs; however, Plaintiffs do maintain that said purchase must be made in good faith, without bad motive and in compliance with the mortgages' terms.

63. Plaintiffs challenge the uncompetitive and unfair method used to select and place the policies which is a result of illegal kickbacks and unearned commissions.

---

[2] <https://www.dfs.ny.gov/node/4476> (last accessed January 13, 2020).
[3] See Testimony of Birny Birnbaum, available at https://www.floir.com/sitedocuments/praetorianbirnbaumtestimony07032012.pdf (last accessed January 13, 2020).

64.     Defendants' manipulation of the force-placed insurance process has maximized the profits to themselves to the great detriment of the Plaintiffs and the Class. Defendants were not and are not, authorized by any federal, state, or local governing body, contract, or agreement to manipulate their force-placed insurance purchases in bad faith, and unconscionable practices. Defendants' exclusive arrangement is in place solely to maximize their profits through the manipulation of the force-placed market by collecting unjustified kickbacks or other compensation. This conduct is prohibited by law.

## C.    PLAINTIFF RAAMS IS A TYPICAL VICTIM OF DEFENDANTS' COMMON COURSE OF MISCONDUCT

65.     On or around January 15, 2020, Plaintiff John Raams purchased a condominium located at 5310 North Ocean Boulevard, North Myrtle Beach, South Carolina 29582 (the "South Carolina Property"). The South Carolina Property was purchased for Plaintiff Raams' personal use and enjoyment. Plaintiff Raams used Rushmore as his loan servicer.

66.     Typical of most mortgages, Plaintiff Raams' mortgage included a provision that required him to secure and pay for adequate property insurance that protected the South Carolina Property against loss by hazards.

67.     In February 2020, Plaintiff Raams received a letter from Rushmore stating that he did not have adequate flood insurance. The letter gave Plaintiff 30 days to provide proof of insurance, otherwise insurance would be purchased on his behalf.

68.     Plaintiff Raams instructed the insurance agent of his homeowner's association to provide Rushmore with proof of insurance, which had been renewed February 1, 2020. Pursuant to Plaintiff Raams request, the insurance agent faxed proof of insurance to Rushmore on February 20, 2020 and furnished to Plaintiff a success of fax on this date.

69.     Despite this demonstration of proof, on March 4, 2020 Plaintiff Raams received a "Second and Final Notice to Provide Flood Insurance" from Rushmore stating

that Plaintiff did not have adequate insurance and requesting that Plaintiff provide proof of insurance through the insurance agent by fax or email.

70.     On March 20, 2020, in response to a direct fax request from Rushmore, the insurance agent of Plaintiff Raams' homeowner's association furnished a second copy of proof of insurance, a copy of the property and liability certificates, to Rushmore.

71.     Plaintiff called Rushmore to confirm receipt of the documentation; during this call Rushmore confirmed receipt. On information and belief, Rushmore told Plaintiff over the phone that they received the documents and Plaintiff should not expect to hear anything further.

72.     On June 8, 2020, Plaintiff received "Notice of Refund of Lender Placed Insurance" advising Plaintiff that insurance coverage of his property was received and there had been flood insurance purchased on his behalf. This insurance was cancelled June 1, 2020. The letter informed Plaintiff that, "[a] premium refund of $420.15 has been credited to [Plaintiff's] loan. An earned premium of $2,084.60 has been charged to your account for the time the policy was in force."

73.     On June 15, 2020 Plaintiff called Rushmore to explain that he was never notified of the force-placed insurance and Rushmore denied any explanation or assistance citing that the loan had been sold. Plaintiff requested documentation detailing the force-placed insurance policy and the withdrawal(s) Rushmore made from his escrow account. Plaintiff never received this documentation.

74.     On June 22, 2020 Plaintiff Raams received an escrow statement by letter indicating Rushmore deducted a total of $2,504.75 from Plaintiff Raams' escrow account by through four transactions in March, April (two withdrawals), and May of 2020, and applied it to the force-placed insurance, causing him injury, financial loss and damage.

75.     Plaintiff Raams and his insurance agent provided proof of insurance to Rushmore following Rushmore's facsimile guidelines and before the deadline on three separate occasions.

76.     After providing proof of insurance, Plaintiff contacted Rushmore by phone

and was told that documents had been received that if he did not hear from Rushmore further, his proof was sufficient.

77.     Plaintiff did not hear from Rushmore again in accordance with his call, and on good faith, believing he provided proof.

78.     Plaintiff never received any indication from Rushmore that the force-placed insurance policy was imposed. Rushmore neglected to provide Plaintiff with any information about the coverage, coverage period, or the name of the Insurer.

79.     The charge imposed and paid by Plaintiff Raams included amounts that were not true costs of insurance as permitted by the contract, including the kickback.

80.     There was no valid basis or authorization for the force-placement of this policy.  The policy was not placed, charged or paid by Plaintiff Raams in any voluntary manner.  Plaintiff Raams never voluntarily paid any premium for any force-placed policy.

81.     Rushmore automatically deducted the Force-Placed Policy's monthly premium of $500.95 from Plaintiff escrow account in March, April, and May of 2020. During the month of April, Rushmore made two withdrawals from Plaintiff's account totaling $1,596.90.

82.     In total, Rushmore debited at least $2,504.75 for the Force-Placed Policy's monthly premiums from Plaintiff Raams' escrow account causing him financial loss and damage.

83.     Upon information and belief, Defendant Rushmore received a substantial kickback or commission from Insurer as a percentage of the premium for the Force-Placed Policy.

84.     Based on the forgoing, Plaintiff Raams was forced to retain counsel and file this class action lawsuit seeking monetary, declaratory and injunctive relief for the defined Class.   As Plaintiff Raams still owns his home in South Carolina, he remains subject to Defendants' unlawful practices, described and challenged herein, in the future. Further Defendants' unlawful conduct is capable of repetition evading review if this matter does not go forward.

85.     As of this filing, Plaintiff Raams has not received any "refund" or payment from Defendants by check, electronic transfer, bank wire, or any other means.

## V.     CLASS ACTION ALLEGATIONS

86.     This action is brought as a class action and may properly be so maintained pursuant to Fed. R. Civ. P. 23 and other applicable rules of civil procedure.  This action seeks recovery of actual damages, restitution, injunctive and equitable relief arising from Defendants' unfair business practices.

87.     **Class Definitions:**  The Class sought to be represented in this action is defined as follows:

**The Nationwide Class**
All borrowers subject to a Fannie Mae or Freddie Mac uniform instrument serviced by Rushmore Loan Management Services, LLC on property located in the United States who were charged or paid premiums for a force-placed insurance policy during the Class Period and did not receive refund of such premiums when they provided evidence to Rushmore demonstrating that they have had in place hazard insurance coverage that complies with their loan contract's requirements to maintain hazard insurance, unless (1) the lender has obtained a foreclosure judgment against the borrower; (2) the borrower has entered into a short-sale agreement with the lender; (3) the borrower has granted a deed in lieu of foreclosure to the lender; (4) the borrower has entered into a loan modification agreement with the lender; (5) the borrower has filed a claim for damages which has been paid in full or part by the force-placed insurer; or, (6) the cost of the force-placed insurance was cancelled out in full (the "California Class").

The Class Period dates back four years (or the length of the longest applicable statute of limitations for any claim asserted) from the date this action was originally filed. Excluded from the Class are: (a) any officers, directors or employees of the Defendants; (b) any judge assigned to hear this case (or spouse or family member of any assigned judge); (c) any employee of the Court; and (d) any juror selected to hear this case.

88.     Plaintiffs reserve the right to modify or amend the above-referenced definitions before the Court determines whether certification is appropriate.

89.     Defendants subjected Plaintiffs and the respective Class members to the

same unfair, unlawful, and deceptive practices and harmed them in the same manner. The conduct described above is the Defendants' standard and undisputed business practice.

90. **Numerosity of the Class.** Members of the Class are so numerous that their individual joinder herein is impracticable. Defendants sell and service thousands of mortgage loans and insurance policies throughout the country. The individual Class members are ascertainable as the names and addresses of all class members can be identified in the business records maintained by Defendants. The precise number of members of the Class is in the thousands and can only be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint and impractical for each to bring suit individually. Plaintiffs do not anticipate any difficulties in the management of the action as a class action.

91. **Ascertainable Class.** The proposed Class is ascertainable. The litigation of the questions of fact and law involved in this action will resolve the rights of all members of the Class and hence, will have binding effect on all class members. These Class members can be readily identified from business records, billing systems, and telephone records of the Defendants and other means readily available to Defendants, and thus by Plaintiffs, through minimally intrusive discovery. The Class is numerous. Joinder of all Class members is impracticable due to the relatively small monetary recovery for each Class member in comparison to the costs associated with separate litigation and likelihood that due to the nature of the lender-placed insurance that Class members faced they may have when initially contacted Defendants, Class members are likely in poor financial situations.

92. **Commonality.** There are questions of law and fact that are common to Plaintiffs' and Class members' claims. These common questions of law and fact exist as to all members of the class and predominate over the questions affecting only individual members of the class. Among such common questions of law and fact are the following:

a. Whether Rushmore failed to terminate the lender-placed insurance when

borrowers provided evidence sufficient to show private flood insurance coverage that complies with 12 C.F.R. § 339.3 and their loan contract's requirements to maintain hazard insurance in violation of 12 C.F.R. § 339.7 *et seq.*;

b.    Whether Defendant failed to refund borrowers in violation of 12 C.F.R. § 339.7 *et seq.*;

c.    Whether Rushmore breached its mortgage agreements with Plaintiffs and the Class by charging them for force-placed insurance that included illegal kickbacks (including unwarranted commissions and reinsurance payments) and by charging Plaintiffs and the Class for servicing the loans;

d.    Whether Defendants owe their customers a duty of good faith and fair dealing, and if so, whether Defendants breached this duty by adding a kickback to the cost of insurance;

e.    Whether Rushmore owes its customers a duty of good faith and fair dealing, and if so, whether it breached this duty by arranging for kickbacks or commissions for itself and/or its affiliates in connection with lender-placed insurance and failing to disclose the same to its customers;

f.    Whether Defendants manipulated the forced-placed mortgage purchases in order to maximize the profits to themselves to the great detriment to Plaintiffs and the Class;

g.    Whether other Rushmore affiliates provide any work or services in order to receive a "commission or other compensation";

h.    Whether Defendants were unjustly enriched by their conduct;

i.    Whether Defendants' form letters are false, deceptive, and/or misleading;

j.    The appropriateness and proper form of any declaratory or injunctive relief; and

k.    The appropriateness and proper measure of monetary and other damages sustained by the Class.

93. **Typicality.** Plaintiffs are members of the Class and their claims are typical of the claims of members of the Class. Typical of other Class members, Plaintiffs were charged and paid an inflated non-competitive premium for a force-placed insurance policy during the Class Period. Plaintiffs have uniform Fannie Mae/Freddie Mac uniform instruments. Plaintiffs and the Class members each sustained, and will continue to sustain, damages arising from Defendants' common and uniform course of wrongful conduct, as alleged more fully herein. Plaintiffs' claims are founded on the same legal theories as those of the Class.

94. **Adequacy of Representation.** Plaintiffs will fairly and adequately represent and protect the interest of the members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and have retained counsel competent and experienced in the prosecution of complex class actions involving consumer fraud, including mortgage fraud. Plaintiffs have no interests contrary to the class members, and will fairly and adequately protect the interests of the Class.

95. To prosecute this case, Plaintiffs have retained the law firm of Zimmerman Reed, LLP. This firm has extensive experience in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

96. The questions of law or fact common to Plaintiffs' and each Class member's claims predominate over any questions of law or fact affecting only individual members of the class. All claims by Plaintiffs and the unnamed Class members are based on the force-placed insurance policies that Defendants unlawfully secured through a common and uniform course of misconduct.

97. Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

98. **Superiority of Class Adjudication.** The certification of a class in this action is superior to the litigation of a multitude of cases by members of the putative class. Class adjudication will conserve judicial resources and will avoid the possibility of

inconsistent rulings. Moreover, there are Class members who are unlikely to join or bring an action due to, among other reasons, their reluctance to sue Defendants and/or their inability to afford a separate action. Equity dictates that all persons who stand to benefit from the relief sought herein should be subject to the lawsuit and hence subject to an order spreading the costs of the litigation among the Class members in relation to the benefits received. The damages, restitution and other potential recovery for each individual member of the Class are modest, relative to the substantial burden and expense of individual prosecution of these claims. Given the amount of the individual class members' claims, few, if any, Class members could afford to seek legal redress individually for the wrongs complained of herein. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

99. In the alternative, the above-referenced class may be certified because:

a. The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members' claims which would establish incompatible standards of conduct for Defendants;

b. The prosecution of separate actions by individual members of the Class would create a risk of adjudications which would as a practical matter be dispositive of the interests of other members of the class who are not parties to the adjudications, or which would substantially impair or impede the ability of other class members to protect their interests; and,

c. Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final and injunctive relief with respect to the Class.

# VI.   COUNTS

## COUNT ONE

### Breach of Contract

### (Against Rushmore On Behalf of the Nationwide Class)

100.   Plaintiffs John Raams and Amy Raams allege and incorporate by reference all the preceding paragraphs above as if fully set forth herein.

101.   Plaintiffs and the Class have standard form mortgage contracts with Rushmore that are similar in all material respects with respect to force-placed insurance. At all times, Rushmore was contractually obligated to service the loans of Plaintiffs and the Class pursuant to the terms of the mortgage contracts.

102.   To the extent the mortgage contracts of Plaintiffs and Class members permitted Rushmore to unilaterally force-place insurance, Rushmore was contractually permitted to do so only to the extent necessary to protect the mortgagee's interest in the secured property.

103.   On information and belief, under these mortgage contracts, Rushmore was permitted to obtain lender-placed insurance in the event of an actual lapse in coverage, however, Rushmore was only permitted to do so in a manner and amount that is reasonable and appropriate to protect an insurable interest in the property.   On information and belief, Rushmore will charge homeowners for true costs of the insurance coverage so obtained and amounts disbursed, nothing in the contract authorizes Rushmore to charge Plaintiffs for amounts retained, rebated or kicked-back to Rushmore or for illusory placement services.

104.   Rushmore breached its mortgage contracts with Plaintiffs and the Class in at least the following respects:

a.   Charging Plaintiffs and the Class for "costs of insurance" that exceeded the true costs of insurance and amounts truly "disbursed" to the insurers;

b.   Exceeding its contractual authority to require borrowers to pay for the cost or expenses the lender incurred for force-placed insurance by requiring

borrowers, such as Plaintiffs and the Class, to pay the full gross amount of the premium for force-placed insurance, irrespective of the fact that the full gross premium amount was not actually an expense or cost to Rushmore because a portion of it was paid back to Rushmore and/or its affiliates in the form of a pre-negotiated commission.

c. Collecting a percentage or allowing its affiliates to collect a percentage of whatever premiums are charged to Plaintiffs and the Class and not passing that percentage on to the borrower, thereby creating the incentive to seek and force-place upon the borrower (i.e., Plaintiffs and the Class) the highest-priced premiums possible;

d. Charging Plaintiffs and the Class for undisclosed kickbacks and commissions in the manner described;

e. Charging Plaintiffs and the Class for compensation placing the insurance when such compensation was not authorized by the contract and no actual services were performed by Rushmore to earn such compensation;

f. Failure to cancel any lender-placed insurance within 15 days of receiving, from Plaintiffs and the Class, evidence demonstrating that Plaintiffs and the Class have had in place hazard insurance coverage that complies with their loan contracts' requirements to maintain hazard insurance; and

g. Failure to Refund to Plaintiffs and the Class, within 15 days of receiving the aforementioned evidence, all force-placed insurance premium charges and related fees paid by them for any period of overlapping insurance coverage and remove from their account all force-placed insurance charges and related fees for such period that Rushmore has assessed to them.

105. As a direct, proximate, and legal result of the aforementioned breaches of contract, Plaintiffs and members of the Class have suffered damage, financial loss and injury.

106. The conduct complained of is ongoing and unless enjoined will continue and

continue to put Class members, including Plaintiffs, at risk of further damage.

107. The conduct set forth above has and continues to harm Plaintiffs and the Class. Unless enjoined, these practices will continue to put Class members at risk of further damage and loss. A declaration of the parties' rights under the contracts is appropriate and sought.

108. By reason of the foregoing, Plaintiffs and each member of the Class are entitled to recover from Defendant damages, restitution, injunctive relief, declaratory relief, the cost of bringing this action (including reasonable attorneys' fees and costs), and any other relief deemed just and equitable in the circumstances.

## COUNT TWO

### Breach of the Implied Covenant of Good Faith and Fair Dealing

### (Against Rushmore On Behalf of the Nationwide Class)

109. Plaintiffs allege and incorporate by reference all the preceding paragraphs above as if fully set forth herein.

110. The implied covenant of good faith and fair dealing is implied in all contracts, including any contracts between Plaintiffs and Rushmore. Good faith and fair dealing is an element of every contract and imposes upon each party a duty of good faith and fair dealing in its performance.

111. The implied covenant of good faith and fair dealing requires a party vested with discretion under a contract to exercise that discretion reasonably and with proper motive, not arbitrarily, capriciously or in a manner inconsistent with the reasonable expectations of the parties.

112. Where an agreement permits one party to unilaterally determine the extent of the other's required performance, an obligation of good faith in making such determination is implied.

113. Where a party to a contract makes the manner of its performance a matter of its own discretion, the law does not hesitate to imply the proviso that such discretion be exercised honestly and in good faith.

114.   In general, the implied covenant of good faith and fair dealing seeks to protect the contracting parties' reasonable expectations and serves to supply limits on the parties' conduct when their contract defers decision on a particular term, omits terms or provides ambiguous terms.

115.   Discretion in performance arises in several ways.  For instance, as here, the parties may find it to their mutual advantage at formation to defer decision on a particular term and to confer decision-making authority as to that term on one of them.  In such situations, the dependent party must rely on the good faith of the party in control.  In such situations courts raise explicitly the implied covenant of good faith and fair dealing, and interpret a contract in light of good faith performance.

116.   Plaintiffs and Class members' mortgage contracts contained a provision that allowed the mortgage servicer to force-place an insurance policy on the borrower if their homeowner's insurance lapsed.  Rushmore was a party to the contract with Plaintiffs and each Class member that made the manner of its performance a matter of its own discretion.   Plaintiffs and other members of the Class, in turn, were dependent on Rushmore and relied on Rushmore as the party in control to act reasonably, in good faith and with proper motive.

117.   In exercising that discretion in Plaintiffs' and Class members' transactions, Rushmore acted unreasonably, in bad faith and with bad motive and intentions. Rushmore's conduct went beyond mere negligence, unreasonableness or the making of poor choices and instead, amounted to acting intentionally with bad motive and bad intention in order to self-deal, maximize profits pursuant to Rushmore's agreement for unauthorized kickbacks with Insurer, and to penalize Plaintiffs and the Class who bore the entire financial burden and cost of the transaction.

118.   In exercising its discretion, Rushmore acted with bad motive and intention in order to self-deal and penalize Plaintiffs and other Class members by purchasing insurance with less coverage and considerably higher premiums than alternative policies available for purchase in the marketplace with no additional burden.  Rather than acting

out of concern for its security, Rushmore seized upon the perceived lapse in coverage as a money-making opportunity for itself and the entities it had private kickback deals with, including Insurer. Rushmore acted not to protect its security in good faith, but rather to increase its profits at the expense of Plaintiffs and the Class by funneling business to entities that it had conspired with and agreed to pay it the largest kickbacks even though Rushmore conducted no work and performed no services to earn any such "commissions" or kickbacks received.

119. Further, the premiums on force-placed policies charged on Plaintiffs and the Class did not reflect the true costs of insurance to Rushmore because a sizeable portion of the premiums charged was secretly retained by and/or refunded to Rushmore as a "commissions" or kickback. Those amounts in no manner reflected the fair value of any services provided. In fact, Rushmore performed no services for the commissions and kickbacks received. These were not costs properly charged to Plaintiffs and the Class.

120. But for the desire to maximize their commission / kickback revenue and the desire to penalize Plaintiffs and the Class, no rational person would have chosen to purchase the type of insurance policies Rushmore did for Plaintiffs and the Class.

121. Mortgage servicers or lenders, like Defendant, are permitted to unilaterally choose the company to purchase force-placed insurance from but have an obligation to exercise their discretion in good faith and not choose the company capriciously and in bad faith (solely for their or their affiliates own financial gain) instead of seeking to continue or re-establish the prior insurance policies or seeking competitive bids on the open market in good faith.

122. In each action described herein, Rushmore acted on its own behalf and as the duly authorized agent of the owner or assignee of the mortgage agreement of Plaintiffs and members of the Class. Rushmore was contractually obligated to service the loans of Plaintiffs and members of the Class pursuant to the terms of the mortgage agreements.

123. The mortgage contracts and insurance policies of Plaintiffs and the Class contained an implied covenant of good faith and fair dealing whereby Defendant agreed

to perform the obligations under the policies in good faith, to deal fairly with Plaintiffs and the Class, and not to charge unnecessarily inflated fees for the lender-placed insurance for the purposes of maximizing their own profits at the Class's expense. Any discretionary authority granted to Rushmore under the terms of Plaintiffs' and members of the Classes' mortgage contracts was subject to Rushmore's implied duty of good faith and fair dealing. Accordingly, to the extent that the mortgage contracts of Plaintiffs and members of the Class permitted Rushmore to unilaterally "force-place" insurance, Rushmore was obligated not to exercise their discretion to do so in bad faith for their own financial gain for the purposes of maximizing profits at borrowers' expense.

124.    Rushmore breached its duty of good faith and fair dealing in at least the following respects:

a.    Failure to make any effort whatsoever to maintain borrowers' existing insurance policies and, instead – for the sole purpose of maximizing their own profits – forcing borrowers to pay for insurance policies from the Insurer. Their policies needlessly came with substantially greater premiums and less coverage than borrowers' existing policies which provided an improper financial benefit to Rushmore and/or its affiliates;

b.    Using their discretion to choose an insurance policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully selecting high-priced force-placed insurance policies to maximize its own profits;

c.    Failure to seek competitive bids on the open market and instead contracting to create "back room" deals whereby the insurance policies are continually purchased through the same companies without seeking a competitive price;

d.    Assessing inflated and unnecessary insurance policy premiums against Plaintiffs and the Class and misrepresenting the reason for the cost of the policies;

e.    Collecting a percentage or allowing its affiliates to collect a percentage of

whatever premiums were charged to Plaintiffs and the Class and not passing that percentage on to the borrower, thereby creating the incentive to seek the highest priced premiums possible;

f.   Charging Plaintiffs and the Class for commissions and claiming it to be a "cost" when the insurance is prearranged and no commission is due; and

g.   Charging Plaintiffs and the Class for having the vendor perform its obligation of administering its mortgage portfolio which is not chargeable to Plaintiff Raams or the Class;

h.   Failure to cancel any lender-placed insurance within 15 days of receiving, from Plaintiffs and the Class, evidence demonstrating that Plaintiffs and the Class have had in place hazard insurance coverage that complies with their loan contracts' requirements to maintain hazard insurance; and

i.   Failure to Refund to Plaintiffs and the Class, within 15 days of receiving the aforementioned evidence, all force-placed insurance premium charges and related fees paid by them for any period of overlapping insurance coverage and remove from their account all force-placed insurance charges and related fees for such period that Rushmore has assessed to them.

125.   As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiffs and the Class have suffered damages, financial loss and injury.

126.   The unlawful and unfair business practices set forth above have and continue to harm Plaintiff Raams and the Class. Unless enjoined these practices will continue and continue to put Class members at risk of further damage and loss. As a result, Plaintiffs and the Class are entitled to injunctive, declaratory and other equitable relief.

127.   By reason of the foregoing, Plaintiffs and each member of the Class are entitled to recover from Defendant damages, restitution, injunctive relief, declaratory relief, the cost of bringing this action (including reasonable attorneys' fees and costs), and any other relief deemed just and equitable in the circumstances.

**COUNT THREE**

**Violation of Biggert-Waters Flood Insurance Reform Act of 2012**

**12 C.F.R. § 339.7** *et seq.*

**(On Behalf of the Nationwide Class Against Rushmore)**

128.     Plaintiffs reallege and reincorporate by reference all the preceding paragraphs above as if fully set forth herein.

129.     Section 339.7 of the Code of Federal Regulations sets forth express requirements and procedures loan servicers such as Rushmore must abide by after they are informed of the required private flood insurance purchased by borrowers such as Plaintiffs.

130.     Section 339.7(b) provides servicers such as Rushmore must terminate and refund borrowers who obtain private flood insurance "Within 30 days of receipt by an FDIC–supervised institution, or a servicer acting on its behalf, of a confirmation of a borrower's existing flood insurance coverage." See 12 C.F.R. § 339.7(b)(1).

131.     The private servicer acting on behalf of the borrower must, "Notify the insurance provider to terminate any insurance purchased by the FDIC–supervised institution or its servicer under paragraph (a) of this section" See 12 C.F.R § 339.7(b)(1)(i); and

132.     "Refund to the borrower all premiums paid by the borrower for any insurance purchased by the FDIC–supervised institution or its servicer under paragraph (a) of this section during any period during which the borrower's flood insurance coverage and the insurance coverage purchased by the FDIC–supervised institution or its servicer were each in effect, and any related fees charged to the borrower with respect to the insurance purchased by the FDIC–supervised institution or its servicer during such period." See " See 12 C.F.R § 339.7(b)(1)(ii).

133.     Paragraph (a) of section 339.7 provides, that the servicer, here, Rushmore, upon determination "that the building or mobile home and any personal property securing the designated loan is not covered by flood insurance or is covered by

32

flood insurance in an amount less than the amount required under § 339.3", "shall notify the borrower that the borrower should obtain flood insurance, at the borrower's expense, in an amount at least equal to the amount required under § 339.3, for the remaining term of the loan." See 12 C.F.R § 339.7(a).

134.   Plaintiff Raams notified Defendant Rushmore through the servicer of his private flood insurance provider multiple times after receiving notice.

135.   Defendant Rushmore failed to confirm the borrower's existing flood insurance under 12 C.F.R § 339.7(b)(1).

136.   Defendant Rushmore failed to comply with 12 C.F.R § 339.7(b) because it failed to terminate the forced-place insurance and refund Plaintiff "all premiums paid by the borrower for any insurance purchased by the FDIC–supervised institution or its servicers." See 12 C.F.R § 339.7(b)(1)(ii).

137.   The amount of time within which servicers such as Rushmore must act to cancel and refund such charges and related fees is also expressly contained within section 339.7(b)(i), which provides: "***Within 30 days of receipt*** by an FDIC–supervised institution, or a servicer acting on its behalf, of a confirmation of a borrower's existing flood insurance coverage…" (Emphasis added).

138.   In February 2020, Plaintiffs received a letter from Rushmore stating that Plaintiffs did not have the required flood insurance documentation and requested they provide such documentation within 30 days, or else, Rushmore may purchase said insurance on their behalf.

139.   Plaintiffs responded to Rushmore's letter immediately by providing the renewal policy certificate to Rushmore.

140.   On or about February 20, 2020, Plaintiffs' insurance agent also provided the required policy renewal certificate to Rushmore via fax to the number provided by Rushmore and received a success of fax on the same day.

141.   On or about March, 20, 2020, Plaintiffs, through their insurance agent, received a direct fax request from Rushmore for such documentation and once again

Plaintiffs, through their insurance agent, provided via fax their proof of private flood insurance coverage.

142.   On or about June 8, 2020, Rushmore sent Plaintiffs a letter entitled Notice of Refund of Lender Placed Flood Insurance, stating that "A premium refund of $420.15 has been credited to your loan. An earned premium of $2084.60 has been charged to your account for the time the policy was in force."

143.   Plaintiffs provided the required flood insurance documentation and Rushmore received such on multiple occasions through February and March 2020.

144.   Rushmore did not cancel the insurance it placed on Plaintiffs' property until June 2020, more than 60 days after they received flood insurance documentation from Plaintiffs.

145.   Following the cancellation of the lender-placed insurance, Rushmore failed to refund Plaintiffs "all premiums paid by the borrower for any insurance purchased by the FDIC–supervised institution or its servicer under paragraph (a) of [section 339.7] during any period during which the borrower's flood insurance coverage and the insurance coverage purchased by the FDIC–supervised institution or its servicer were each in effect, and any related fees charged to the borrower with respect to the insurance purchased by the FDIC–supervised institution or its servicer during such period." See 12 C.F.R. § 339.7(b)(1)(ii).

146.   Plaintiffs were injured in fact and lost money and property as a result of Defendant's violation of See 12 C.F.R. § 339.7.

147.   Plaintiffs see civil penalties under 42 U.S.C. § 4012a(f)(2)(B) for violations of 42 U.S.C. § 4012a(e)(1)-(6).

**COUNT FOUR**

**Violation Of The Unfair Competition Law**

**Cal. Bus. & Prof. Code §17200 *et seq.***

**(On Behalf of the Nationwide Class Against Defendants)**

148.   Plaintiffs allege and incorporates by reference all the preceding paragraphs

above as if fully set forth herein.

149. Plaintiffs bring this claim on their own behalf and on behalf of the Nationwide Class members.

150. California's Unfair Competition Law (the "UCL") defines unfair competition to include and "unlawful, unfair, or fraudulent" business act or practice. Cal. Bus. & Prof. Code § 17200, *et seq.*

151. Rushmore engaged in unfair business practices under the UCL because its actions, as described herein, are immoral, unethical, oppressive and substantially harmful to Plaintiffs and the Class; and the justification for Rushmore's practices and conduct is outweighed by the gravity of the injury to Plaintiffs and the Class.

152. Plaintiffs and the Class were injured in fact and lost money or property as a result of these unfair business practices. In particular and without limitation, Plaintiffs and the Class paid and incurred unreasonable and unnecessarily inflated commissions and/or kickbacks in connection with Defendants' force-placed insurance policies.

153. By reason of the foregoing, Plaintiffs and each member of the Class are entitled to recover from Defendants restitution, declaratory relief, the cost of bringing this action (including reasonable attorneys' fees and costs), and any other relief deemed just and equitable in the circumstances.

**COUNT FIVE**

**Money Had and Received (Restitution)**

**(Against Rushmore On Behalf of the Nationwide Class)**

154. Plaintiffs allege and incorporate by reference the preceding paragraphs above as if fully set forth herein, except those inconsistent with this count.

155. Rushmore received from Plaintiffs and Class members a benefit in the form of overcharges related to lender-placed insurance policies – specifically in the form of undisclosed and unwarranted kickbacks and commissions.

156. Defendants entered into an agreement whereby Insurer would provide lender-placed insurance policies to Rushmore through its preferred insurance carriers for

the portfolio of loans it monitored which were paid for by Plaintiffs and the Class at prices that were far higher than the market rates for policies that provide even more coverage.

157. Insurer paid and collected significant monies in kickbacks, commissions, and reinsurance tied directly to the cost of the lender-placed insurance premium (as a percentage). These commissions or kickbacks were paid to the Rushmore and/or their affiliates in order to be able to exclusively provide lender-placed insurance policies.

158. The kickbacks and commissions were subsumed into the price of the insurance premium and ultimately paid by the borrower. Therefore, Defendants had the incentive to charge and collect inflated prices for the force-placed policies.

159. As a result, Plaintiffs and the Class have conferred a benefit on Rushmore and Rushmore had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on them – kickbacks and commissions.

160. Rushmore will be unjustly enriched if it is allowed to retain the benefit, and each Class member is entitled to an amount equal to the amount each class member enriched Rushmore and for which Rushmore has been unjustly enriched.

161. Nothing herein seeks to stop Insurer or other insurers from selling lender-placed insurance policies, or end the Defendants' practice of placing lender-placed insurance on properties. Plaintiffs only seeks that Defendants provide the same in good faith and not at inflated and noncompetitive prices.

162. The unlawful and unfair business practices set forth above have and continue to harm Plaintiffs and the Class. Unless enjoined these practices will continue and continue to put Class members at risk of further damage and loss. Plaintiffs and the Class are entitled to equitable relief.

163. By reason of the foregoing, Plaintiffs and each member of the Class are entitled to recover from Defendant restitution, declaratory relief, the cost of bringing this action (including reasonable attorneys' fees and costs), and any other relief deemed just and equitable in the circumstances.

**COUNT SIX**

**Unjust Enrichment**

**(Against Rushmore On Behalf of the Nationwide Class)**

164.  Plaintiffs allege and incorporate by reference the preceding paragraphs above as if fully set forth herein, except those inconsistent with this count.

165.  Rushmore received from Plaintiffs and Class members a benefit in the form of overcharges related to lender-placed insurance policies – specifically in the form of undisclosed and unwarranted kickbacks and commissions.

166.  Defendants entered into an agreement Insurer would provide lender-placed insurance policies to Rushmore through its preferred insurance carriers for the portfolio of loans it monitored which were paid for by Plaintiffs and the Class at prices that were far higher than the market rates for policies that provide even more coverage.

167.  Insurer paid and collected significant monies in kickbacks, commissions, and reinsurance tied directly to the cost of the lender-placed insurance premium (as a percentage).  These commissions or kickbacks were paid to Rushmore and/or their affiliates in order to be able to exclusively provide lender-placed insurance policies.

168.  The kickbacks and commissions were subsumed into the price of the insurance premium and ultimately paid by the borrower.  Therefore, Defendants had the incentive to charge and collect inflated prices for the force-placed policies.

169.  As a result, Plaintiffs and the Class have conferred a benefit on Rushmore and Rushmore had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on them – kickbacks and commissions.

170.  Rushmore will be unjustly enriched if it is allowed to retain the benefit, and each Class member is entitled to an amount equal to the amount each class member enriched Rushmore and for which Rushmore has been unjustly enriched.

171.  Nothing herein seeks to stop Insurer or other insurers from selling lender-placed insurance policies, or end the Defendants' practice of placing lender-placed insurance on properties. Plaintiffs only seek that the Defendants provide the same in good

faith and not at inflated and noncompetitive prices.

172. The unlawful and unfair business practices set forth above have and continue to harm Plaintiffs and the Class. Unless enjoined these practices will continue and continue to put Class members at risk of further damage and loss. Plaintiffs and the Class are entitled to equitable relief.

173. By reason of the foregoing, Plaintiffs and each member of the Class are entitled to recover from Defendant Rushmore restitution, declaratory relief, the cost of bringing this action (including reasonable attorneys' fees and costs), and any other relief deemed just and equitable in the circumstances.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, as individuals and on behalf of all those similarly situated, pray for relief and judgment against Defendants, jointly and severally, as follows:

A. For an order certifying the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiffs and their undersigned counsel to represent the Class;

B. For preliminary and permanent injunctive relief prohibiting Defendants from engaging in the wrongful practices alleged in this Complaint;

C. For civil penalties pursuant to 42 U.S.C. § 4012a(f);

D. For damages sustained by Plaintiffs and the Class (as to Counts 1, 2, 3, 5 and 6 only);

E. For restitution;

F. For disgorgements of profits;

G. For payment of reasonable attorneys' fees and costs pursuant to the "common fund" doctrine, statutory fee-shifting provisions, equitable principles of contribution, and/or any other applicable method of awarding attorneys' fees and costs in class actions;

H. For payment of costs of suit incurred herein;

1  I.  For payment of prejudgment interest as provided by law; and,

2  J.  For any such further relief as this Court deems equitable, just and proper.

3  **VIII. JURY TRIAL DEMANDED**

4  Plaintiffs seek a trial by jury for all appropriate issues on each and every count in

5  this Complaint.

6  Respectfully submitted,

7  ZIMMERMAN REED LLP

8  Date: April 20, 2020          By:   /s/ Christopher P. Ridout
                                       Christopher P. Ridout
9                                       Arielle M. Canepa
                                       2381 Rosecrans Avenue, Suite 328
10                                      Manhattan Beach, CA 90245
                                       (877) 500-8780 Telephone
11                                      (877) 500-8781 Facsimile

12                                      *Attorneys for Plaintiffs*